UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

HENDERSON GARRIS,

                    Petitioner,                    Case No. 1:05-cv-209

v.                                          Honorable Wendell A. Miles

CINDI CURTIN,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner Henderson Garris is serving two terms of 23 to 35 years, imposed by the Muskegon County Circuit Court on December 17, 2002, after a jury convicted Petitioner, as a fourth habitual offender, of two counts of armed robbery, MICH. COMP. LAWS § 750.529. In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

I.      THE EVIDENCE PRESENTED BY THE PROSECUTION WAS INSUFFICIENT TO SUSTAIN A JURY VERDICT OF GUILTY OF TWO COUNTS OF ARMED ROBBERY WHERE THE CRIMES WERE COMMITTED AS THE RESULT OF DURESS UPON DEFENDANT.

II.     THE PROSECUTION FAILED TO PRODUCE SUFFICIENT EVIDENCE AT TRIAL TO SUSTAIN A JURY VERDICT FINDING THAT DEFENDANT WAS GUILTY BEYOND A REASONABLE DOUBT OF THE CRIME OF ARMED ROBBERY MCLS 750.529 AGAINST VANESSA DAVIS.

III.    DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL BY THE INTRODUCTION OF TESTIMONY THAT HE FAILED TO EXONERATE HIMSELF WHEN INTERROGATED BY DETECTIVE TREJO, AFTER INVOKING HIS RIGHT TO REMAIN SILENT.

IV.   DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS BY THE INTENTIONAL PROSECUTORIAL MISCONDUCT, IN IMPROPER AND HIGHLY PREJUDICIAL ARGUMENT TO THE JURY WHEN HE: VOUCHED FOR HIS WITNESSES AND BOLSTERED THE TRUTHFULNESS OF HIS CASE; DENIGRATED THE DEFENDANT, HIS DEFENSE AND DEFENSE COUNSEL; MISCHARACTERIZED THE EVIDENCE, AND THEN MISREPRESENTED THE APPLICABLE LAW.

Respondent has filed an answer to the petition (docket #8), stating that the grounds should be denied because they are procedurally defaulted and/or without merit.  Upon review and applying the AEDPA standards, I find that ground one is a noncognizable state-law claim, ground four is procedurally defaulted and grounds two and three are without merit.  Accordingly, I recommend that the petition be denied.

**Procedural History**

**A.  Trial Court Proceedings**

The state prosecution arose from the February 17, 2002 armed robbery of the two owners of a home-based retail clothing business located in Muskegon, Michigan.  Petitioner and an accomplice, Darshawn Larkin, were charged with two counts of armed robbery.  Petitioner was served a notice of intent to enhance any sentence imposed as a fourth habitual offender.  Following a preliminary examination on March 22, 2002, he was bound over on the charges.  Petitioner was tried before a jury beginning November 19, 2002, and concluding on November 20, 2002.

Anthony Davis testified that he and his wife co-operated a business called Footers Clothing Store.  At the time of trial, the store was a full-time occupation and was located at its own business address.  (Tr. I, 98-99.)  However, at the time of the robbery, on February 17, 2002, the Davises operated the store on a part-time basis out of the basement of their home at 1394 Getty Street in Muskegon.  (Tr. I, 99.)

- 2 -

According to Anthony Davis, at approximately 6:30 or 7:00 p.m. on February 17, 2002, two customers came to the house to look at the clothing selection.  The customers were led into the basement store, where they examined the merchandise for five to eight minutes.  Mr. Davis crossed the room to show the sweaters to the shorter customer.  The shorter man struck Mr. Davis in the back of the head using his fist, causing him to go down to the floor, and the taller man pulled a gun and pointed it at Mr. Davis.  (Tr. I, 100-02.)  Both men went through Davis' pockets and one of the two men took his wallet and asked where the money was.  Davis told the men that he did not have any money, as it was a Sunday.  (Tr. I, 102-03.)  The taller man held the gun to the back of Davis' head while the shorter man made several trips from the basement, up the stairs, and outside, carrying loads of clothing.  (Tr. I, 104.)  The taller man repeatedly ordered Davis not to move or say anything.  (Tr. I, 106.)

Davis' wife, Vanessa Davis, came down the stairs to see what was going on.  Mr. Davis tried to tell her to go back upstairs, but the taller man told him to be quiet.  The shorter man took hold of Vanessa and told her to be quiet.  (Tr. I, 106-07.)  Shortly thereafter, someone came to the door of the house.  The robbers allowed Vanessa Davis to go toward the door, but ordered her to call out to the person that they were closed.  The man at the door refused to leave, however, saying that he had found Mr. Davis' wallet in the driveway.  (Tr. I, 107.)  The taller man got Mr. Davis to his feet and told the other robber and Vanessa Davis to go upstairs.  (Tr. I, 108, 114-15.)  As soon as she was upstairs, Vanessa Davis pushed the panic button, which sounded a siren and alerted the police department.  (Tr. I, 108.)  The robbers ran out of the house.  (Tr. I, 108-09.)  Anthony Davis joined his wife upstairs and remained inside the house until the police arrived.  (Tr. I, 109.)

- 3 -

Anthony Davis described the taller robber as being skinny, weighing between 140 and 160 pounds.  He described the other man as being short and stocky with a big scar over his left eye.  (Tr. I, 109-10.)  Anthony Davis later viewed two photographic lineups prepared by Detective Trejo.  In the first lineup, he identified the taller robber.  In the second lineup, he identified Petitioner as the shorter robber.  (Tr. I, 110.)  Mr. Davis again identified Petitioner in the courtroom.  (Tr. I, 111.)

Vanessa Davis testified that, on the evening of February 17, 2002, she heard a sound come from her basement sometime after her husband had taken two men down to the store to look at clothing.  She went downstairs to investigate.  As she descended, she saw her husband on the floor and a man standing over him, holding a gun.  (Tr. I, 118.)  She did not initially notice the second man, who was standing by the racks of clothes.  (Tr. I, 119.)  Vanessa Davis testified that, when her husband saw her, he began screaming, "Get out of here!  Get out of here!"  But when she turned to leave, the shorter man said, "Oh, no, you don't."  (Tr. I, 119.)  She began to back up, and her husband told her to stay calm and not to do anything.  (Tr. I, 119-20.)  The shorter man then began to grab clothes and asked her, "[W]here [i]s the 'stash'"?  (Tr. I, 120.)  She believed that, when he referred to "stash," the man meant money.  She told the shorter man that they had spent it.  (Tr. I, 120.)

According to Vanessa Davis, during all of this time, the taller robber held the long, silver handgun pointed directly at her husband's temple.  (Tr. I, 120.)  At some point, the doorbell rang upstairs.  After the bell had run a few times, one of the two robbers told Vanessa Davis to go and get rid of whoever was at the door.  The shorter man followed her and told her not to go all the way to the top of the stairs.  (Tr. I, 121.)  She went up about three of the six stairs toward the garage

- 4 -

level, and her head was a little above the garage floor.  (Tr. I, 122.)  Customers entered the store by coming through the garage door, which had windows from the waist level up.  (Tr. I, 123.)  Mrs. Davis called to the customer at the door that they were closed.  (Tr. I, 124.)  The person at the door stated, "I just want to return the wallet.  I just want to return Tony's wallet."  He claimed that he had found the wallet on the ground in the driveway.  (Tr. I, 125.)  Mrs. Davis turned to ask the man behind her what she should do.  The robber said nothing, but her husband told her to say, "We're arguing.  Go away."  (Tr. I, 125.)  Vanessa Davis testified that she attempted to signal the visitor by eye contact, but that she was unsuccessful.  (Tr. I, 125.)  The man remained where he was, saying, "I just want to give him his wallet."  (Tr. I, 126.)  The shorter robber then asked, "So what we going to do," and the taller man got her husband to his feet and led him toward the stairwell, holding the gun to his head at all times.  (Tr. I, 126.)  The taller man told Vanessa Davis, "Just let him in . . . . You better not try anything or so help me."  (Tr. I, 126.)  She responded that she would not try anything.  (Tr. I, 126.)

Vanessa Davis then let the visitor in and led him past the basement door, to the right and up the four stairs into the house.  (Tr. I, 127-29.)  The two robbers were not visible.  (Tr. I, 128-29.)  She led the visitor into the living room and hit the panic button on the alarm in her kitchen doorway.  (Tr. I, 129.)  A loud siren went off and the system connected the alarm to the police station.  (Tr. I, 130.)  She ducked down, as did the customer who accompanied her.  (Tr. I, 130.)  A few seconds later, her husband joined her and slammed the door.  As her husband came into the room, she saw someone rush past the door and out the garage.  (Tr. I, 130.)  Either she or her husband eventually turned off the alarm, and the police arrived shortly thereafter.  (Tr. I, 130.)

Mrs. Davis described both men for the police.  She described the shorter one as "shorter, darker skinned, husky built."  She noticed but did not tell the police about the shorter man's scar over his left eye.  (Tr. I, 132.)  She subsequently viewed two photographic lineups.  She identified the taller robber in the first lineup.  (Tr. I, 133.)  She identified Petitioner in the second lineup as the shorter robber.  (Tr. I, 134.)  Mrs. Davis testified that her husband was not with her at the time she viewed the lineups and that no one hinted or suggested that she identify any particular photograph.  (Tr. I, 134.)  She again identified Petitioner at trial.  (Tr. I, 134.)

Muskegon Police Officer Scott Hepworth testified that he arrived at the scene within two minutes of the dispatch order.  (Tr. I, 142.)  He described both Anthony and Vanessa Davis as being agitated and upset.  (Tr. I, 143-44.)  Approximately a week after the robbery, Hepworth stopped a car matching the description of the car seen leaving the robbery, in which two people were riding.  The passenger was a man fitting the description of the taller robber, Darshawn Larkin.  The car was driven by a woman wearing a gold jumpsuit similar to the clothing the Davises described being worn by the taller robber.  He noticed the man wearing new apparel and boots matching items stolen from the Davises.  He arrested Larkin that night.  (Tr. I, 147-48.)  Hepworth testified that he searched the car and did not find a weapon.  He found a 9 millimeter cartridge in the car.  (Tr. I, 149.)

Lisa Willson testified that she was the girlfriend of Darshawn Larkin.  She was driving the car at the time Larkin was arrested.  She later talked to Detectives Trejo and Burnham.  She advised them that she did not know anything about the robbery.  (Tr. I, 151-52.)  She knew Petitioner was a friend of Larkin's.  (Tr. I, 152.)  Willson testified that, sometime after Petitioner had been arrested, he made a collect call to her house claiming to be Larkin.  When she accepted the

charges, Petitioner identified himself and asked her to make a call for him.  She connected a three-way call to Petitioner's girlfriend.  (Tr. I, 154-55.)  She then overheard Petitioner tell his girlfriend to "pull out all stops and get it down to one person."  (Tr. I, 156.)  She wrote the remark down and subsequently shared it with Larkin's attorney and the prosecutor.  (Tr. I, 156.)  On cross-examination, Willson acknowledged that the police had searched the home she shared with Larkin and had taken all of the new clothes Larkin had brought home.  (Tr. 157-58.)  Willson also stated that the police found a gun in the car on the night Larkin was arrested, and she told the police that the cartridge that was found in the car was meant for Squeaky.  (Tr. I, 158, 160.)

Muskegon Police Detective Kory Luker testified that, on the night of  February 25, 2002, he participated in the arrest of Darshawn Larkin, assisting Detectives Ferrier and Corrigan and Officer Gust.  (Tr. I, 162.)  He also participated in Petitioner's arrest ten days after the incident. (Tr. I, 163.)  Luker testified that the police had information that Petitioner was frequenting a particular house.  They periodically knocked at the address to see if someone was home.  On the night of the arrest, Luker and Officer Gust knocked at the upper apartment of the house.  After determining that Petitioner was not staying there, the officers went downstairs.  They discovered the door slightly cracked open, appearing to have been pried.   The officers entered the home, announcing themselves loudly.  They found a woman in bed with a man, who had the covers pulled over his face.  The woman gave a false name of the man under the covers.  Luker pulled the covers off and found Petitioner.  (Tr. I, 164-65.)  Petitioner was arrested.  (Tr. I, 166.)  Luker did not discover either stolen clothing or a gun in the home.  (Tr. I, 167-68.)

Muskegon Detective Emilio Trejo testified that he spoke with both Anthony and Vanessa Davis on separate occasions.  Based on the description given by Mr. Davis and the

information from Hepworth's traffic stop of a vehicle matching the one that fled the robbery, Trejo tentatively identified Larkin. He prepared a six-person photographic lineup, which he showed to Vanessa and Anthony Davis separately. (Tr. I, 169-70.) The lineup, which includes, Larkin, was identified and introduced as People's Exhibit 1. Both of the Davises identified Larkin as the taller of the two robbers. (Tr. I, 172.)

Police records indicated that Willson was the girlfriend of Larkin, and Trejo went to Willson's parents' home to look for Larkin. They told Trejo that Larkin lived in the basement with their daughter, but that he was out of the house in their blue car. (Tr. I, 173-74.) Trejo obtained a search warrant for the house. He requested the assistance of Detectives Ferrier and Corrigan to execute the warrant, and they were assisted by Officers Gust and Luker. (Tr. I, 174.)

After Larkin had been arrested, Trejo interviewed him about his involvement in the robbery. Larkin identified Petitioner as the second robber. (Tr. I, 175.) Trejo prepared a second six-person photographic lineup containing Petitioner's photograph. Both the Davises identified Petitioner in the second lineup. (Tr. I, 175-76.) Trejo then attempted to locate Petitioner, discovering that he frequented a particular house. He told Officers Luker and Gust to go to the address while he went to second address. (Tr. I, 177.)

Trejo eventually searched Larkin's vehicle after it had been impounded. He found a weapon identified as People's Exhibit 3. (Tr. I, 178.) The weapon was a BB gun that looked like a .45 caliber or 9 millimeter automatic weapon. (Tr. I, 180.)

The prosecutor then made a motion *in limine* outside the presence of the jury, in which he proffered Trejo's testimony that Petitioner had made a brief statement after he had been given his *Miranda* warnings. (Tr. I, 183.) The prosecutor represented that he intended to ask Trejo

whether Petitioner claimed to have been threatened or under duress.  (Tr. I, 184.)  The court granted the prosecutor's motion.  (Tr. I, 185.)  The following morning, Petitioner sought reconsideration of the court's ruling.  (Tr. II, 191-95.)  The court again concluded that, where a defendant has decided to speak to police after warnings, the prosecutor is entitled to inquire into whether the defendant told police about the defense he raises at trial.  (Tr. II, 196.)

Trejo returned to the witness stand.  (Tr. II, 202.)  Trejo testified that Mr. Davis had provided him a list of clothing items stolen from the store.  (Tr. II, 203.)  During the search of Larkin's residence, only a small amount of the merchandise was recovered.  (Tr. II, 204.)  The people rested.  (Tr. II, 206.)

The defense called Laquandra Robinson. (Tr. II, 209.)  Robinson testified that she had known Petitioner for eight years and had been living with him since April 2001.  (Tr. II, 209.)  Robinson stated that she knew Larkin, but could not remember him visiting her house.  (Tr. II, 210-11.)  She was present when Petitioner was arrested.  (Tr. II, 211.)  Robinson testified that during the period between the robbery and his arrest, Petitioner never brought new men's clothing to her home or indicated that he had any influx of money during that period.  (Tr. II, 212.)  On cross-examination, Robinson acknowledged that Petitioner did not mention that he had been involved in a robbery or that he had been subjected to duress by Larkin.  (Tr. II, 213-14.)  He did not mention that he feared for his own life or that of his family at any time prior to his arrest.  (Tr. II, 214.)  Robinson also acknowledged that, when the police came to Petitioner's sister's home to arrest Petitioner, Robinson had lied about the identity of the person in bed with her in order to protect Petitioner.  (Tr. II, 216-17.)

Petitioner took the stand and testified that he had known Larkin since 1990 or 1991, when he had played high school football with him.  (Tr. II, 222.)  They had socialized some, but were not regular companions.  (Tr. II, 223.)  Near the end of 2001, Petitioner ran into Larkin at the store.  Larkin told Petitioner that he had just gotten out of prison.  (Tr. II, 223-24.)  Petitioner and Larkin began to make contact regularly.  Larkin sold marijuana to Petitioner about three times per week.  (Tr. II, 224-25.)  Larkin extended credit to Petitioner and, over a period of time, Petitioner owed Larkin more than $400.  (Tr. II, 225.)  The two did not have a social relationship.  (Tr. II, 225.)  Larkin began calling Petitioner frequently about the debt.  (Tr. II, 226-27.)  At the end of January 2002, Petitioner and Larkin had a specific discussion about the money Petitioner owed, but Petitioner remained unable to pay his debt.  (Tr. II, 227.)  On the night of the robbery, Larkin drove to Petitioner's home in a blue, four-door Buick Century.  Larkin told Petitioner that he and "Squeaky" had been in a shoot-out.  (Tr. II, 229.)  Larkin told Petitioner to get in the car to take a ride.  After some time, Larkin drove to the Davis' home.  Larkin showed Petitioner the handgun. Petitioner claimed, however, that he did not realized a robbery was planned at that time.  The two went up to the house and rang the bell.  (Tr. II, 230.)  According to Petitioner, he had never been to the house before.  (Tr. II, 230.)  After they had rung the bell, Larkin pulled out the gun and pointed it at Petitioner, telling him, "You're going to help me.  You're going to help me hit this lick (sic)." Larkin warned Petitioner that he would help him "hit the lick" to clear his debt or Larkin would do something to Petitioner and his family.  (Tr. II, 231.)  Petitioner did not know that the gun was a BB gun.  (Tr. II, 231.)  Petitioner did not know what Larkin planned until they went down the basement and he saw the store.  (Tr. II, 232.)  Petitioner did not know Larkin intended an armed robbery until

he pulled the gun on Mr. Davis.  Petitioner testified that he did not strike Davis, nor did he assist in bringing him to the floor.  (Tr. II, 234.)

        After Larkin forced Davis to the floor, Larkin searched Davis and removed his wallet. Larkin threw the wallet to Petitioner.  Larkin had told Petitioner to, "Clear this place out," and, at the time Larkin threw the wallet toward him, Petitioner was grabbing all the clothes that he could. (Tr. II, 236.)  The wallet landed in the pile of clothes.  (Tr. II, 242.)  Petitioner carried the clothes outside to the car.  (Tr. II, 236-37.)  The wallet apparently dropped out of the clothes when he took them to Larkin's car.  (Tr. II, 242-43.)

        Petitioner testified that he did not run away when he went outside because Larkin had threatened to hurt Petitioner's family if Petitioner did not help him with the robbery.  (Tr. II, 237.) Petitioner returned to the basement and was grabbing more clothes when Mrs. Davis came down the stairs.  (Tr. II, 238.)  Petitioner said nothing to her.  (Tr. II, 238.)  Mr. Davis called to his wife to, "Do exactly what he say."  (Tr. II, 240.)  Larkin told Mrs. Davis to come over toward him and ordered her not to "attempt anything or else."  (Tr. II, 240.)

        The doorbell began to ring, and Larkin told Mrs. Davis to go upstairs to get rid of the caller.  The person at the door called out to Mrs. Davis that he had a wallet.  Mrs. Davis told him to come back later as they were busy.  When he insisted on returning the wallet to Mr. Davis, Mrs. Davis told the caller that they were having a fight and he needed to come back later.  (Tr. II, 241.) Larkin then told Mrs. Davis to let the person in, but to take him upstairs.  (Tr. II, 244.)  Petitioner testified that he did not have any conversation with Mrs. Davis.  (Tr. II, 244.)  When Mrs. Davis let the person in the door and took him upstairs, Petitioner ran out the door.  He did not take any clothes or other items with him.  He just wanted to get away.  (Tr. II, 245-46.)  Petitioner ran to his sister's

- 11 -

home, where he lived part of the time.  (Tr. II, 246-47.)  According to Petitioner, he did not speak

with or see Larkin after the robbery.  (Tr. II, 247.)

On cross-examination, Petitioner acknowledged that he had two prior convictions for

breaking and entering.  (Tr. II, 249.)  Petitioner denied striking Mr. Davis and denied that Davis had

been struck by Larkin.  (Tr. II, 252-53.)  Petitioner also denied having taken any money from Davis'

wallet.  (Tr. II, 255-56.)  Petitioner testified that he did not hear the alarm, as he already had run

away.  (Tr. II, 262.)  According to Petitioner, he at all times appeared scared and timid, but he did

not attempt to explain or communicate with the victims.  (Tr. II, 267-68.)  He also acknowledged

that he did not attempt to contact the police.  (Tr. II, 268.)  He further acknowledged that he never

told his girlfriend about the threats or warned her about Larkin.  (Tr. II, 270.)  When the police came

to arrest him, Petitioner asserts he did not initially reveal himself because he was thought he was

being sought on other warrants.  (Tr. II, 274.)

After Petitioner was arrested, he spoke with Detective Trejo.  The prosecutor asked

if Petitioner had told Trejo that Larkin had forced him to participate.  Petitioner responded that he

had told Trejo he wanted a lawyer.  (Tr. II, 279.)  Defense counsel had previously lodged an

objection to the questioning and again objected when the question drew an answer about Petitioner's

invocation of the right to counsel.  (Tr. II, 279-81.)  Defense counsel sought a mistrial, which the

court denied on the grounds that Petitioner's answer was nonresponsive.  (Tr. II, 280-81.)  Based

on counsel's arguments, the court became concerned that Petitioner had made no statement before

invoking his right to counsel.  Subsequently, the court took additional testimony from Detective

Trejo outside the presence of the jury in order to confirm that Petitioner had made some sort of

statement before invoking his right to counsel.  According to Trejo, Petitioner denied having

committed the offense and then asked for an attorney. (Tr. II, 284-87.)  The court reaffirmed its prior ruling and permitted the questioning.   The court denied the mistrial but offered a curative instruction, which defense counsel declined.  (Tr. II, 287.)  The jury returned.  (Tr. II, 288.)

Petitioner denied making any statement to Trejo.  When asked if he told Trejo he was under duress, Petitioner claimed he simply asked for an attorney.  Petitioner testified that as soon as he asked for an attorney, Trejo turned off the tape recorder.  (Tr. II, 289.)  Petitioner repeated that he had not made any statement to Trejo.  (Tr. II, 305.)  Petitioner also denied contacting Larkin's girlfriend, Lisa Willson, from jail.  (Tr. II, 306.)  The defense rested.  (Tr. II, 311.)

On rebuttal, the prosecutor called Diane Willson, mother of Lisa Willson.  Diane Willson testified that, after Larkin began to reside in her home in early 2002, Petitioner called the home eight to ten times, asking for Larkin.  (Tr. II, 312.)  She testified that Petitioner had come to her house on one occasion.  (Tr. II, 313.)  Diane Willson also testified that she never saw Larkin with marijuana or knew him as a drug dealer.  (Tr. II, 314.)

The prosecutor recalled Mr. Davis to the stand.  Davis reiterated that he was facing the taller robber when he was hit from behind, presumably by the shorter robber.  (Tr. II, 316.)  He also confirmed that both Petitioner and Larkin searched his pockets for his wallet.  (Tr. II, 317.)  Davis testified that Petitioner left the store at least three or four times carrying clothing.  *Id*.  According to Davis, both robbers were in the store when the alarm went off.  At no time did Petitioner appear to Davis to be frightened.  (Tr. II, 318.)

The prosecutor also recalled Mrs. Davis, who repeated that Petitioner was the robber who told her not to go back upstairs and demanded to know where the "stash" was.  (Tr. II, 322-23.)  Petitioner stood next to her on the stairs and never appeared frightened or nervous.  (Tr. II, 324.)

- 13 -

Officer James Gust testified that he participated in Petitioner's arrest.  (Tr. II, 326-27.)  He and Officer Luker identified themselves as officers and spoke with Laquandra Robinson, who falsely identified the man in her bed as "Terry."  According to Gust, the officers ordered Petitioner to come out from under the covers at least five times.  (Tr. II, 328.)  At no time did Petitioner try to explain to Gust that he had been under duress at the time of the robbery.  (Tr. II, 329.)

Detective Trejo again confirmed his prior testimony that Petitioner had not raised the defense of duress at the time of his arrest.  (Tr. II, 329.)  Trejo testified that his records did not indicate that a tape recording had been made of any statement by Petitioner.  (Tr. II, 336.)  The prosecution again rested.  (Tr. II, 337.)

At the conclusion of trial, on November 20, 2002, the jury found Petitioner guilty of two counts of armed robbery.  (Tr. II, 403.)  Following certain admissions by Petitioner, the court found Petitioner guilty on a superseding indictment of being a fourth felony offender.  (Tr. II, 409.)  On December 17, 2002, Petitioner was sentenced to serve two concurrent terms of imprisonment of 23 to 35 years.  (Sentencing Transcript, ("S. Tr."), 51, docket #17.)

## B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 5, 2003, raised the same four issues as raised in this application for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #18.)  By unpublished opinion issued on April 27, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 4/27/04 Mich. Ct. App. Opinion ("MCOA Op."), docket #18.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same four claims presented to and rejected by the Michigan Court of Appeals.  By order entered October25, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #19.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied, Texas v. Penry*, 126 S. Ct. 2862 (June 12, 2006). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the

decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).       A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.      Sufficiency of Evidence – Defense of Duress

In his first ground for habeas relief, Petitioner contends that the prosecutor failed to introduce sufficient evidence to disprove Petitioner's defense of duress. A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988). The *Jackson* decision instructs that constitutional review for the sufficiency of evidence must be made "with explicit reference to the substantive elements of the criminal offense as defined by state law." 443 U.S. at 324 n.16. *See also In re Winship*, 397 U.S. 358, 364 (1970) (due process is satisfied if the prosecution proves every element of a charged offense beyond a reasonable doubt). The Sixth Circuit has held that challenges to evidence on non-elements generally do not implicate the due process concerns addressed by *Jackson* and *Winship*. *See Gall v. Parker*, 231 F.3d 265, 286-

87, 307-08 (6th Cir. 2000) (addressing Kentucky law of insanity), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 740 (6th Cir. 1999) (holding that Jackson "does not implicate affirmative defenses, because proof of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime"), *abrogated on other grounds by* 28 U.S.C. § 2261 *et seq. See also Allen*, 858 F.2d at 1200.

Under Michigan law, duress is not considered an element of substantive criminal charges, but is instead a common-law affirmative defense. *See People v. Lemons*, 562 N.W.2d 447, 453 (Mich. 1997) (citing MICH. CT. R. 2.111(F)(3)(a)); *United States v. Bailey*, 444 U.S. 394, 415 (1980)); MICH. COMP. LAWS § 768.21a. With respect to armed robbery, the essential elements "are (1) an assault, and (2) a felonious taking of property from the victim's person or presence, while (3) the defendant is armed with a weapon described in the statute." *People v. Allen*, 505 N.W.2d 869, 871 (Mich. Ct. App. 1993); *see also* MICH. COMP. LAWS § 750.529. A showing of duress would not negate proof of any of those essential elements. As a result, a claim that the prosecution failed to meet its burden to disprove duress is not cognizable in a habeas proceeding because it fails to raise a federal constitutional issue. *Duffy v. Foltz*, 804 F.2d 50, 54 (6th Cir. 1986); *Gall*, 231 F.3d at 304.

II.    Sufficiency of the Evidence – Armed Robbery

Petitioner next contends that the prosecution introduced constitutionally insufficient evidence to support the second count of armed robbery from Vanessa Davis. Specifically, he argues that the prosecutor failed to prove the second element of the offense: that any property was taken in Vanessa Davis' presence.

The "concurrent sentencing doctrine" invests the court with discretion to decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction.  *See United States v. Wade*, 266 F.3d 574, 578, (6th Cir. 2001); *United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992); *Dale v. Haeberlin*, 878 F.2d 930, 935 n. 3 (6th Cir. 1989).  The doctrine has its origins in appellate practice applicable to direct review of criminal cases.  *See Benton v. Maryland*, 395 U.S. 784, 788-91 (1969); *Hirabayashi v. United States*, 320 U.S. 81 (1943).  Applying the principle, the Supreme Court and the Sixth Circuit have declined to review convictions on one count where the presence of a valid concurrent count is sufficient to retain the defendant in custody.  *See, e.g., Hirabayashi*, 320 U.S. at 105; *United States v. Burkhart*, 529 F.2d 168, 169 (6th Cir. 1976).  The standard guiding the court's discretion is whether there exists any possibility of an adverse "collateral consequence" if the conviction is allowed to stand.  *See Hughes*, 964 F.2d at 541; *Dale*, 878 F.2d at 935 n.3; *see also United States v. Byrd*, No. 89-6448, 1990 WL 116538, at * 3 (6th Cir. Aug. 13, 1990).

Here, Petitioner is serving two concurrent terms of 23 to 35 years on two convictions for armed robbery.  The present petition challenges only the second armed robbery conviction.  Thus, even if the court were to vacate the second conviction, the maximum relief available would be invalidation of that sentence, leaving petitioner with the identical 23 to 35 years for his conviction on the other armed robbery charge.  Accordingly, the relief sought by petitioner, release from prison, would not be available even if the second armed robbery conviction challenged in this petition were vacated.

- 19 -

Moreover, even were the Court to review the substantive issue, sufficient evidence would support the jury's verdict. As the Michigan Court of Appeals noted, Vanessa Davis expressly testified that Petitioner "started grabbing down clothes," and asked her while doing so, "Where was the stash?" (Tr. I, 120.) The court noted that Petitioner himself had conceded that he was grabbing items while in Vanessa Davis' presence. (Tr. II, 238.) On the basis of these facts, the court of appeals concluded that sufficient evidence supported the jury's verdict on the second count of armed robbery. (4/27/04 MCOA Op. at 2.)

Petitioner correctly notes that his own testimony does not support the conclusion that he removed clothing from Vanessa Davis' physical presence. Instead, he testified that, due to the interruption caused by the man at the door, he did not take clothes out of the basement after Vanessa Davis came downstairs. (Tr. II, 241-46.) Nevertheless, Vanessa Davis' testimony alone was sufficient to support a reasonable jury's determination that clothes were taken from her presence. As a result, "viewing the evidence in the light most favorable to the prosecution, [a] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

For both reasons, I conclude that Petitioner is not entitled to relief under § 2254.

III.     Use of Silence Against Petitioner

In his third ground for habeas relief, Petitioner argues that he was denied his right to a fair trial when the court permitted the prosecutor to cross-examine Petitioner about his failure to raise the defense of duress at the time of his arrest and initial questioning.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."     In *Doyle v. Ohio*, 426

U.S. 610 (1976), the Supreme Court squarely held that "that the use for impeachment purposes of petitioner's silence, at the time of the arrest and after receiving *Miranda* warnings, violated due process." *Id.* at 619. As the Sixth Circuit has recognized, "[t]he theory underlying *Doyle* is that while *Miranda* warnings contain no express assurance that silence will carry no penalty, 'such assurance is implicit to any person who receives the warnings.'" *Combs v. Coyle*, 205 F.3d 269, 279 (6th Cir. 2000) (quoting *Doyle*, 426 U.S. at 618)). Petitioner argues that, during both cross-examination of Petitioner and closing argument, the prosecutor improperly used his post-arrest silence to impugn his duress defense.

During cross-examination, the prosecutor unquestionably challenged Petitioner on his claim of duress, asking whether Petitioner had asserted the defense when he was first arrested. The prosecutor, however, at no time questioned Petitioner in a manner proscribed by *Doyle*.

"*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles*, 447 U.S. 404, 408 (1980); *see also Gravley v. Mills*, 87 F.3d 779, 786-89 (6th Cir. 1996) (prosecutor's cross-examination and repeated references to defendant's post-arrest silence went far beyond calling jury's attention to inconsistency in statements, and thus violated *Doyle*); *Hockenbury v. Sowders*, 718 F.2d 155, 160 (6th Cir. 1983) (no *Doyle* error occurred where prosecutor questioned petitioner about differences in statements).

The Michigan Court of Appeals carefully considered the issue and, applying parallel Michigan law, *see People v. Davis*, 477 N.W.2d 438, 440 (Mich. Ct. App. 1991) (citing *Doyle*), found no violation. The court of appeals held that the trial court had properly distinguished between

a situation in which the defendant said nothing following his *Miranda* warnings and one in which the defendant made a statement inconsistent with his defense at trial. (4/27/04 MCOA Op. at 3-4.) The court held that, had Petitioner said nothing, his silence about the defense of duress could not be used against him. However, the trial court found that Detective Trejo's police report and trial testimony supported a conclusion that Petitioner had denied having committed the offense. Because Petitioner chose to make a statement denying his participation in the robbery, both the trial court and the Michigan Court of Appeals found that the prosecutor properly questioned Petitioner about the inconsistencies in his statements.

Both the trial court and the court of appeals made preliminary findings of fact that are subject to a presumption of correctness by this Court on habeas review. *See* 28 U.S.C. § 2254(e)(1) *Sumner*, 449 U.S. at 546; *Smith*, 888 F.2d at 407 n.4. Petitioner failed entirely to demonstrate by clear and convincing evidence that the court's preliminary findings regarding his statements to Trejo were erroneous. 28 U.S.C. § 2254(e)(1). Indeed, those findings are well supported by the evidence.

Having found that the Petitioner made statements to Trejo denying his involvement in the robbery, the Michigan courts reasonably applied Supreme Court precedent in *Anderson v. Charles*, 447 U.S. at 408, permitting the prosecutor to question Petitioner about the inconsistencies between his post-arrest statement and his defense at trial. Accordingly, the state-court decision constituted a reasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d).

IV.    Prosecutorial Misconduct

In his final ground for habeas relief, Petitioner raises a series of complaints regarding the prosecutor's closing arguments, asserting that the prosecutor's comments amounted to prosecutorial misconduct.  The Michigan Court of Appeals found that Petitioner had waived his claim by failing to make a contemporaneous objection at trial.  The court nevertheless reviewed the alleged violations for plain error and found no error affecting Petitioner's substantial rights. (4/27/04 MCOA Op. at 4-5.)

The State contends that Petitioner's claim is procedurally defaulted.  It further argues that, assuming Petitioner could demonstrate cause excusing his procedural default, he fails to demonstrate constitutional error.  I agree.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 126 S. Ct. at 2076-77. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

Petitioner has made no attempt to demonstrate cause excusing his default. His claim of prosecutorial misconduct, therefore, is barred on habeas review.

- 24 -

Moreover, assuming Petitioner could make such a showing, Petitioner fails to raise a claim of constitutional magnitude. Before habeas corpus relief becomes available, prosecutorial misconduct must be so egregious as to deny petitioner a fundamentally fair trial. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court may view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Darden*, 477 U.S. at 182-83. "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir.1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

I have reviewed each of the alleged improprieties in the prosecutor's closing argument and find no error. The Michigan Court of Appeals' determination constitutes a reasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d). I therefore conclude that Petitioner's fourth ground for habeas relief is both procedurally defaulted and without merit.

### **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated: February 11, 2008                         /s/ Hugh W. Brenneman, Jr.
                                                 HUGH W. BRENNEMAN, JR.
                                                 United States Magistrate Judge

- 25 -

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).